## Louis Charles Shapiro, P.A.

*1063 East Landis Avenue*
*Vineland, New Jersey 08360*
*Telephone (856) 691-6800; Facsimile (856) 794-3326*

**LOUIS CHARLES SHAPIRO**
CERTIFIED CRIMINAL TRIAL ATTORNEY
LL.M. IN TRIAL ADVOCACY
MEMBER OF NJ AND PA BARS

**SAMUEL L. SHAPIRO**
ATTORNEY AT LAW
COUNSELOR AT LAW
1940 (ADMITTED TO NJ BAR) - 1996

Email: shap1@prodigy.net
Website: www.louischarlesshapiro.com

December 3, 2021

**LETTER BRIEF**

**BY ELECTRONIC FILING (ECF)**
Hon. Ann Marie Donio, U.S.M.J.
United States District Court for the District of New Jersey
Mitchell H. Cohen U.S. Courthouse, Room 2010
1 John F. Gerry Plaza, 4th & Cooper Streets
Camden, New Jersey 08101

      Re:    Audra Capps, et al. v. Joseph Dixon, et al.
             Case No.: 1:19-cv-12002-RMB-AMD

             Tanika Joyce, et al v. Joseph Dixon, et al.
             Case No.: 1:20-cv-01118– RMB-AMD

Dear Judge Donio:

## I. INTRODUCTION

On January 17, 2020, former Millville police officer, Defendant Joseph Dixon, was placed

on two years of probation and given a suspended county jail sentence following his guilty pleas to

two third-degree aggravated assault charges brought by the New Jersey Attorney General's Office

of Public Integrity and Accountability ("OPIA"). A copy of Dixon's Judgment of Conviction is

attached as Exhibit "A." Dixon's two criminal convictions stem from the same assaultive conduct

1

incidents against two women, Plaintiffs Audra Capps and Tanika Joyce, that gave rise, along with conduct by other Defendants, to these lawsuits. A copy of the transcript of Dixon's November 20, 2019 plea colloquy in Superior Court, Cumberland County, is attached as Exhibit "B." To have a police officer with criminal convictions directly tied to two victims, who are then the plaintiffs in a civil action against him, is a rare state of affairs. Yet in spite of Defendant Dixon's precarious position in this litigation, he has -- during the pendency of these civil actions – compounded matters by committing evidence spoliation, for which he now must be held accountable.

## II.  BACKGROUND

### A.  Dixon Was on Notice of Potential Litigation as Early as May of 2018.

Plaintiff Capps and her husband, Plaintiff Douglas Robert Gibson, Jr., first placed Dixon and others on notice of potential litigation when they served a New Jersey tort claim notice on May 25, 2018, following Dixon's assault on Capps on February 25, 2018. A copy of the Capps Tort Claim Notice is attached to the Certification of Counsel as Exhibit "C." Plaintiffs Capps and Gibson filed their original Complaint in this Court on May 1, 2019. See Doc. No. 2. The Court's Order for Scheduling Conference filed on July 31, 2019 mentioned the topic of discovery of digital information, and is attached to the Certification of Counsel as Exhibit "D."

### B.  Plaintiffs Specifically Sought ESI From Dixon As Early as October of 2019.

Plaintiffs in the Capps case served written discovery requests upon Dixon on October 15, 2019. The document requests to Dixon contained paragraphs seeking the following categories of information:

> 1. All posts and messages of any variety, from January 1, 2009 to the present, whether such account(s) is/are still active or closed, whether set to "public" or "private" or like designation, to accounts created by, opened by, controlled by you

2

and/or associated with you in any way for the categories of social media platforms set forth in Request No. 2 below.

2.  Access to allow Plaintiffs to inspect and/or have reproduced, on a date and at a location agreed to by all parties, all physical and electronic information, including but not limited to, electronic data storage, cellular telephone data, digital images, computer images, cache memory, searchable data, emails, text messages, any and all online social or work related websites, entries on social networking sites (including but not limited to, Facebook, Twitter, SnapChat, Instagram, MySpace, etc.), closed circuit TV footages, surveillance audio and video footages/recordings, and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this action. This demand includes any and all such evidence created up to the date this lawsuit is completely concluded.

*   *   *

24.  All documents reflecting any communications, police department action, notes made, documents created, emails, text messages sent and/or received, and/or social media messages or postings sent or made by you, and/or which you were involved in response to, or as a result of, any reporter's inquiry or questioning in connection with the Newark Star Ledger/NJ Advance Media/NJ.com investigation referred to in paragraphs 111-135 of the Complaint.

*   *   *

35.  Documents evidencing all communications you had with Defendant Officer Orndorf and/or any third-persons regarding the events and allegations described in the Complaint.

36.  Documents evidencing all communications you had with Chief Farabella regarding the events and allegations described in the Complaint.

37.  Documents evidencing all communications you had with any other member of the Millville Police Department regarding the events and allegations described in the Complaint.

A copy of the October 15, 2019 letter transmitting written discovery requests in the Capps case is attached as Exhibit "E" to the Certification of Counsel. Plaintiffs' Interrogatories to Dixon, which were served at the same time, additionally contained the following discovery request:

3

25. Identify all non-privileged communications you have initiated, received, and/or were copied on relating to the subject matter set forth in the Complaint, and identify all documents relating to such communications.

Following a claim of non-receipt of Plaintiffs' October 15, 2019 discovery requests by one or more of the Defendants,[1] Plaintiffs re-sent them on January 28, 2020. Copies of email communications to this effect are attached as Exhibit "F" to the Certification of Counsel.

In addition, and by way of context for this motion, Plaintiff Capps's and Gibson's Second Amended Complaint filed September 16, 2020 contains, among other things, the following details:

175. During his employment with the Millville Police Department, Dixon received discipline or counseling for, among other things, not properly submitting evidence and for missing court proceedings. But when it came to incidents involving the use of excessive force as they were occurring, and as Dixon was filling out his 80 UOF forms along the way, Defendant Chief Farabella and the other individual Supervisory Defendants had his back, and failed to act in the face of mounting documentary and video evidence that Dixon was a problem waiting to happen.

176. Moreover, upon information and belief, the Supervisory Defendants named herein either failed to notice or looked the other way when, as NJ.com reported in connection with its series called The Force Report in late 2018, Dixon posted thoughts and memes to his public Facebook account to defend how other police officers use force, and to disparage critics of police tactics.

177. Specifically, and according to emails from an NJ.com reporter to Defendant Chief Farabella seeking comment, Defendant Dixon allegedly made statements on Facebook about police force, about his concern for Islam and for Muslim immigrants destroying the United States. Additionally, and according to this email communication, Dixon in 2016 posted a video depicting a peaceful arrest in Florida with the statement: **"You don't get shot or 'assaulted' when you shut your mouth and use your ears and comply"** (bold added).

178. Upon information and belief, and as further reported by NJ.com, approximately three weeks after NJ.com reached out to Dixon about his posts, the privacy settings on Dixon's Facebook account changed, and the posts are no longer visible.

---

[1]To the extent any of the parties claimed non-receipt of the October 15, 2019 discovery requests, such claim is countered by the record of email transmission of that date.

4

Capps Second Am. Compl., pars. 175-178, Doc. No. 58 (bold in original).  While the articles from NJ.com's "Force Report" series came out in or about December 2018, Dixon was clearly already deemed to be on notice of potential litigation as a result of Plaintiffs' filing of a Tort Claim Notice several months earlier.

C.     **Dixon Obstructs Discovery.**

In his responses to Plaintiffs' discovery requests in the Joyce matter, which were similar to those served in the Capps case, Dixon provided little in the way of actual answers and information. Copies of Dixon's undated Answers to Interrogatories and Responses to Document Requests are attached to the Certification of Counsel as Exhibits "G" and "H."  In response to a number of discovery deficiencies, Plaintiffs sent Defendants a lengthy letter on or about July 28, 2021.  What followed were letters back and forth, telephone conferences with the Court, and the entry of various Orders.  There was some agreement on the production of documents, reached primarily with Defendants other than Dixon.

In response to these events, Dixon submitted a response on September 8, 2021, and wrote to the Court on the same date.  Copies of these documents are attached to the Certification of Counsel as Exhibit "I."  However, Dixon's September 8, 2021 supplemental response was uncertified.  Following a telephone conference, the Court issued an Order dated September 29, 2021, directing Dixon to "revise his responses to Plaintiffs' interrogatories and document requests to clarify whether he has conducted searches for the requested documents and no such documents exist or whether no search was conducted."  A copy of the Court's September 29, 2021 Order is attached as Exhibit "J."  The Court, in the same Order, granted Plaintiffs leave to take Dixon's deposition on

"all issues of ESI and social media as set forth on the record, without prejudice to Plaintiffs' right to depose Defendant Dixon at a later date on other issues in these cases . . . ." Id.

Prior to his ESI deposition, Dixon submitted a "Supplemental Certification to Discovery Responses" on October 13, 2021, a copy of which is attached to the Certification of Counsel as Exhibit "K." Dixon's ESI deposition thereafter took place on October 21, 2021, and the testimony adduced from Dixon will be discussed in greater detail below. As a result of a subsequent telephone conference on November 17, 2021, the Court issued an Order which, inter alia, directed Plaintiffs to file any motion for the failure to preserve ESI no later than December 3, 2021. A copy of the Court's November 17, 2021 Order is attached as Exhibit "L." That November 17, 2021 Order also directed Defendants to produce all outstanding documents and ESI no later than December 15, 2021.

**D.     Dixon's October 21, 2021 Deposition Reveals ESI Spoliation.**

Prior to the day of his ESI deposition, October 21, 2021, Dixon was aware that he was to give a deposition on the issues of social media and ESI. See 10/21/21 Dixon Dep. at 13:59, attached as Exhibit "M" to the Certification of Counsel. Dixon was further aware his deposition would be taken on those issues at the time he signed his October 13, 2021 Supplemental Certification, discussed above. Id. at 13:24-14:1, 14:10-17, 15:15-19. As placed on the record in the deposition, Dixon certified in that Supplemental Certification, among other things, that "[t]o the best of my knowledge, I have not purposely or intentionally altered or destroyed any materials sought in Plaintiffs' Request for Production of Documents" (emphasis added). A comparison of Plaintiffs' specific discovery requests described above, and Dixon's deposition testimony discussed in more detail below, reveals that Dixon's certification was false.

6

After initially stating that he turned in his iPhone 10 for an iPhone 13 in 2020, id. at 17:3-10,

Dixon testified that he traded in his iPhone 10 for an iPhone 13 at the beginning of the month of

October 2021 ("October, this month"), id. at 19:23-20:10. The timing of this phone turn-in not long

after the Court's September 29, 2021 Order directing the taking of Dixon's ESI deposition gave rise

to further questions at that deposition. This was particularly the case when one considered two

October 13, 2021 public Twitter posts by Dixon's wife, one of which included the use of the word

"wipe" in reference to a phone, while the other post indicated that Dixon's phone was also turned

in. See 10/13/21 Darbi Dixon Twitter posts, attached to the Certification of Counsel as Exhibit "N."

On this subject, Dixon said that his wife turned in her phone to an AT&T store between October 10-

13th, while he turned in his phone approximately one week earlier. 10/21/21 Dixon Dep. at 23:14-

17, 24:3–11. Dixon said that he and his wife both turned in their phones because, "We were

available for upgrade." Id. at 27:10-11.

Importantly, and with respect to Dixon's turn-in of his iPhone 10 for an iPhone13, he testified

under oath that "everything" was preserved. Id. at 24:23-25:2. "...There's a thing called the cloud,"

he said, "[i]t just transfers it over to the new phone." The data from Dixon's old iPhone 10 – which

be believed he had in 2018 -- is available to him and can be accessed on his new phone, according

to this testimony. Id. at 25:8-15, 28:3-4. When Dixon was asked whether "all of the records of text

message history" were preserved, he responded, "Whatever was on the 10, yes." Id. at 25:23-26:1.

(Later testimony showed that this was not exactly the case.) If a search was done of the "cloud" or

on his current iPhone 13, text messages would be able to be recovered. Id. at 26:2-5; see also id. at

45:12-16. And from the time the lawsuit was filed the only phone Dixon had, until he turned in his

phone in October, was his iPhone 10. Id. at 33:3-9.

7

When asked how many contacts he had of employees who worked for the Millville Police Department, Dixon responded that there were "[t]oo many to name" and "[p]retty much the whole department." Id. at 33:15-35:4. This included co-defendant Bryan Orndorf (who was involved in the Audra Capps arrest on February 25, 2018), non-party Officer Albert Chard (who was involved in the Tanika Joyce arrest on March 24, 2018), and some of the previously named Supervisory Defendants. Id. at 34:3-6, 41:15-42:22. While Dixon claimed that, "to the best of my knowledge" none of the texts he received from other members of the Millville Police Department related to investigations or cases he was working on, he was "sure" that he was texted by co-workers. Id. at 44:9-13, 43:18-44:3.

In his ESI deposition, Dixon also agreed that the Capps lawsuit was filed in early May of 2019 ("sounds about right"). Id. at 32:11-20. However, he testified that since the case started, he deleted text message history:

> Q. Since this case started, let's say in or about May 1st of 2019, did you ever delete any text message history?
> A. Yes.
> Q. Okay.  Which text message histories did you delete?
> A. Old ones.
> Q. Old ones from whom?
> A. Anybody.
> Q. Did that anybody include members of the Millville Police Department?
> A. I do not recall.
>                              *   *   *
> Q. As you sit here today, do you know whether you still have text message history from, let's say, Sergeant Redden?
> A. I do not believe so.
> Q. How about Officer Orndorf?
> A. I do not believe so.
> Q. Do you still have any text message history to or from Albert Chard?
> A. I'm not sure.
> Q. How about any text message history involving an Officer Runkle?
> A. I don't believe so.

Q.  Is it possible that you deleted some text messages to and from other Millville Police Department employees from May 1st, 2019 to the present?
A.  It is possible.
Q.  As you sit here today, do you know which conversations you deleted?
A.  I do not.
Q.  At the time that the lawsuit was filed in or about May 1st of 2019, were you ever aware of the need to preserve electronic information?
A.  I was not.
Q.  At any time since the lawsuit was filed, are you aware generally of the need to preserve electronic information?
A.  I am now.
Q.  When did you become aware?
A.  When the social media was ordered.
Q.  And what's your understanding of when the social media was ordered?
A.  I believe you said September 30th.
Q.  Okay.  So just recently?
A.  Yes.
Q.  And prior to September 29th or 30th, which is, I believe, the dates [sic] of this Order, prior to that date, is it your testimony that you were not aware that you had to preserve electronic information?
A.  I believe so.
Q.  So is it possible that prior to September 29th of this year, you deleted certain electronic information?
A.  Yes.
Q.  And prior to September 29th of this year, is it also possible that you deleted certain posts from any social media accounts?
A.  I believe that's possible.
Q.  Is it your testimony that you first became aware of the need to preserve electronic information when the September 29th Order came out?
A.  I believe so.

Id. at 45:17-48:12 (emphasis added). When asked what "reasonable inquiry" or "investigation" he

undertook, Dixon testified that he "went through my text history that I had, my social media pages

that I use." Id. at 51:10-52:5.  He further said that he did not believe he made inquiries or

investigation to look for documents, prior to the end of September or early October. Id. at 52:20-24.

Dixon further testified that he took "twenty, thirty minutes" to look for text messages after he

became aware of the Court's order, and "roughly the same time" looking for social media accounts.

Id. at 54:4-16; see also id. at 75:7-16 ("twenty-five minutes"). And, to the best of his recollection,

he made no search of any electronic device prior to the issuance of the Court's Order, id. at 54:17-20,

and he did not believe he did anything else to search for electronic documents, other than two

twenty-five minute blocks of time, id. at 75:13-16. He further testified: "I do not believe there is

anything relevant to the cases at hand." Id. at 55:23-56:3; see also discussion at 65:9-71:6.

### E.   Dixon Deleted His Prior Facebook Account While Litigation Was Pending.

Dixon, in his October 13, 2021 Supplemental Certification, also stated, among other things:

"... I certify that I maintained a Facebook account under the user name 'Stevie Joe' until I deactivated

or deleted that account approximately 1 ½ years ago, and I currently maintain a Facebook account

under 'Sepp Stephens.'" See Exhibit "K;" and see "Sepp Stephens" Facebook page, at Exhibit "O"

to the Certification of Counsel. Dixon further testified that he changed his Facebook account from

"Joe Dixon" to "Stevie Joe" when he became a police officer. Id. at 76:7-25.

Critically, Dixon testified that he deleted his "Stevie Joe" Facebook account "around about"

April of 2020, though he was already aware of the Capps lawsuit in May of 2019. Id. at 77:11-22.

His stated reason for doing so does not emerge as credible:

> Q. So what was the reason that you deactivated the account after knowing about the
> existence of the litigation against you?
> A. **Mental health**.
> Q. When you say mental health, what do you mean by that?
> A. **I was tired of seeing articles shared about me. So I decided to take a break.**

Id. at 77:24-78:6 (bold added). This explanation is questionable at best when the Court considers

that Dixon was seeing articles through both his Facebook account and generally on the internet. Id.

at 78:20-24. Dixon's testimony continued as follows:

> Q. Were there any other reasons you decided to deactivate the Stevie Joe account?

10

> A. No.
> Q. Just mental health?
> A. Correct.
>
> *   *   *
>
> Q. Do you disagree at all in terms of the time frame about when you deactivated the Stevie Joe account approximately, let's say, April of 2020?
> A. I would say that's an approximation but a correct one.
> Q. What kind of articles were you seeing?
> A. About my arrest.

Id. at 78:7-11, 78:25-79:6. Because articles about Dixon's arrest and prosecution were (and still are) available on the internet, taking a break and deactivating a Facebook account he had during his time as a police officer would not have solved the problem. The content is out there.

Curiously, Dixon also certified in his October 13, 2021 Supplemental Certification that, "In the course of this litigation, I have attempted to recover the prior Facebook account and, learned that the account has been deleted permanently." See Exhibit "K"; and see generally id. at 81:1-84:15 for testimony on efforts Dixon allegedly took to contact Facebook. This attempt to recover his Facebook account, Dixon testified, was a separate effort from the two blocks of twenty-five minutes he previously described in which he looked for electronic information. 10/21/21 Dixon Dep. at 79:17-80:4. He claimed that, when he "found out that social media was admissible," he attempted to recover the Facebook account again. Id. at 80:13-14 (emphasis added). But when asked when was the first time he tried to recover his "Stevie Joe" Facebook account, he testified: "Approximately eight, nine months ago." Id. at 80:15-21.

Yet earlier in the same deposition Dixon testified that he did not know he had to preserve ESI until the Court's September 29, 2021 Order was issued:

> Q. At the time that the lawsuit was filed in or about May 1st of 2019, were you ever aware of the need to preserve electronic information?
> A. I was not.

11

> Q. <u>At any time since the lawsuit was filed, are you aware generally of the need to</u>
> <u>preserve electronic information?</u>
> A. <u>I am now.</u>
> Q. <u>When did you become aware?</u>
> A. <u>When the social media was ordered.</u>
> Q. <u>And what's your understanding of when the social media was ordered?</u>
> A. <u>I believe you said September 30th.</u>

Dixon's testimony, with respect, is inconsistent at best, and troubling at worst. If Dixon was not aware of the need to preserve ESI until September 30, 2021, why would he separately go looking to see if he could reactivate his "Stevie Joe" Facebook account eight or nine months before?

As part of a follow-up article, NJ.com made inquiry of Defendant Chief Farabella the day the Capps lawsuit was filed, and asked about Dixon's public Facebook postings regarding: (1) Dixon's alleged concern about Islam and Muslim immigrants destroying the United States; and (2) a 2016 posted video of a peaceful arrest in Florida with the writing "You don't get shot or 'assaulted' when you shut your mouth and use your ears and comply." <u>See</u> Exhibit "P" to the Certification of Counsel. NJ.com also noted in an article on November 20, 2019 after the entry of Dixon's guilty pleas that Dixon's Facebook's privacy settings were changed about three weeks after NJ.com reached out to Dixon about his posts, but the posts were no longer visible. A copy of the November 20, 2019 article is attached as Exhibit "Q" to the Certification of Counsel. When asked whether it was possible that he posted content described in the NJ.com inquiry, Dixon said, "I'd say it's possible" as to "both the reports." 10/21/21 Dixon Dep. at 98:22-100:15. He claimed, however, that he was not sure "if the verbiage is correct." <u>Id.</u> at 100:17-18, 101:22-23, 107:16-22; <u>and see</u> generally <u>id.</u> at 98:14-107:22. Indeed, being able to check on the "verbiage" might still be possible had Dixon not affirmatively and intentionally deleted the electronic information – during litigation.

**F.      It is Now Unclear Whether Dixon Will Even Turn Over
the ESI he Did Not Manage to Already Delete.**

Following the November 23, 2021 deposition of Officer Bryan Orndorf, one of Dixon's co-defendants in the Capps case, and not on the deposition record, there was discussion with regard to the production of documents by December 15, 2021.  At that time, and based on Dixon's testimony at his October 21, 2021 ESI deposition, Plaintiffs made inquiry whether Dixon would be submitting his cell phone or the "cloud" version of his cell phone data for examination.  On Dixon's behalf, a reluctance to doing so was expressed, together with concerns for whether Plaintiffs were entitled to ESI materials, and together with a desire to re-read the Dixon ESI deposition transcript.  See Certif. of Counsel, par. 20.  Dixon's position to not turn over his data – if that ultimately remains his position – misses the point: There would be no reason for a court to order the taking of a deposition to determine the existence and sources of ESI and then not allow a party to thereafter conduct an examination of the data that may actually still exist.  Separate and apart from the data that may still exist, discussed below, there clearly is ESI that no longer exists.

### III.      LEGAL ARGUMENT

**A.      The Standards Under Federal Rule of Civil Procedure 37(e).**

The federal rules have established a liberal system of discovery "meant to insure that no relevant fact remain[s] hidden."  Crawford v. Dominic, 469 F. Supp. 260, 262 (E.D.Pa. 1979) (Pollak, J.).  Spoliation, however, is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably forseeable [sic] litigation." Mosaid Techs. Inc. v. Samsung Elecs. Co., 348 F.Supp.2d 332, 335 (D.N.J. 2004). Where a party spoliates evidence, courts have the discretion to impose sanctions. Id.

13

"Until recently, district courts in the Third Circuit relied on both the Federal Rules of Civil Procedure and the inherent authority of the court in imposing sanctions for spoliation of any kind of evidence." Bistrian v. Levi, 448 F.Supp.3d 454, 464 (E.D. Pa. 2020). "In 2015, however, Federal Rule of Civil Procedure 37 was amended to provide a uniform standard governing spoliation sanctions for the loss of electronically stored information." Id. "Prior to the 2015 amendment, courts applied the Third Circuit's general spoliation test to both ESI and other information." Id. at 465 n.14. Since 2015, some district courts within the Third Circuit have continued to apply the Third Circuit's general test to determine whether spoliation occurred while applying Rule 37(e) in considering what sanction is appropriate, and others have relied exclusively on Rule 37(e). See id. "Although the Third Circuit has not specifically clarified this issue, it appears that Rule 37(e) exclusively governs the spoliation inquiry, while both Rule 37(e) and the Third Circuit's own three-factor test govern the sanctions inquiry." Id. Accordingly, "[w]here the amended rule applies, it provides the exclusive remedy for spoliation of electronically stored information ('ESI'), foreclosing reliance on the court's inherent authority." Id. (citation omitted).

Rule 37(e) specifically provides as follows:

> (e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;

14

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

( C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). The Advisory Committee's notes to the 2015 amendment further explain the elements of spoliation of ESI. For a court to make a finding that spoliation occurred, the moving party must show that (1) the ESI should have been preserved in anticipation or conduct of litigation; (2) the ESI was lost; (3) "the information was lost because the party failed to take reasonable steps to preserve" it; and, (4) because ESI "often exists in multiple locations, " spoliation occurs only where the information is truly lost and not cannot be recovered elsewhere, restored, or replaced. Fed.R.Civ.P. Advisory Committee Notes, Fed.R.Civ.P. 37; Bistrian, 448 F.Supp.3d at 465 n.14. Upon finding that spoliation has occurred, the court must then determine what sanction(s) to impose. Rule 37(e)(1) and Rule 37(e)(2) provide a framework for determining the appropriate sanction for spoliation of ESI. A court may resort to (e)(1) measures only upon finding prejudice to another party from the loss of the information. Fed.R.Civ.P. Advisory Committee Notes, Fed.R.Civ.P. 37.

With respect to Dixon's Facebook posts, the prejudice to Plaintiffs is plain. During his deposition, Dixon admitted generally that he posted items along the lines suggested in the NJ.com's reporter's inquiry, but he quibbled with the "verbiage." The only way to know the exact "verbiage" he used is to be able to see the actual posts, and others like them. However, according to Dixon's deposition testimony,  and the alleged efforts he made to reactivate his "Stevie Joe" Facebook account, those posts, and anything else that might have been reasonably calculated to lead to the discovery of admissible evidence, are lost.

With respect to Dixon's alleged 2016 post reflective of his attitude on the use of force, being able to see this post, and other similar posts, goes directly to Plaintiffs' municipal liability and/or supervisory liability claims.  As stated in the <u>Capps</u> Second Amended Complaint:

> 228.  But in a chilling foreshadowing of what was on the horizon, Internal Affairs observed in February of 2016 that, although Dixon's excessive force complaints resulted in findings of "exonerated" or "unfounded," he was still showing a pattern. Defendant Chief Farabella in March of 2016 concurred with a recommendation made by the Cumberland County Prosecutor's Office's Chief of Detectives and by the Millville Police Department's own Internal Affairs Unit that Dixon should be sent to a training course called "Verbal Judo" due to the excessive force complaints made against him in a two-year period.

> 229.  There were three Millville officers sent to that mere four-hour "Verbal Judo" training session in 2016.  Two of them were Dixon and now-former Millville Police Officer Jeffrey Profitt, who will be further mentioned in the Third Count of this Second Amended Complaint.

> 230.  Defendant Chief Farabella, who was, as he admitted, the person in charge of Internal Affairs and in the running of the Millville Police Department, in ultimately recommending such a lax measure in the face of a pattern of excessive force, was sending a clear message to the Supervisory Defendants and to the MPD's officers in general that excessive force would be tolerated and that no serious disciplinary measures would be taken.

> 231.  The City of Millville's own documents conclusively establish that Defendant Chief Farabella knew about Dixon's pattern of excessive force one year and several months prior [sic] the Barry Cottman incident in June of 2017, and a full two years before the Capps and Joyce incidents in February and March of 2018.  They were on notice.

Second Am. Compl., at pars. 228-231, Doc. No. 58.  These allegations, based on documents produced in discovery by the City of Millville, suggest that in the same year Dixon was making his publicly available Facebook post reflecting his attitude on the use of force, various other Defendants in this case were already aware that he was showing a pattern.  In light of this observed and identified "pattern," Defendants should have been supervising Dixon more closely.  Not only would such posts

reflect negatively on the Millville Police Department as a law enforcement organization, but they would – or should – have triggered actual discipline in order to stem the tide of Dixon's use of force before he really injured someone – which, of course, he eventually did.  In addition, as a result of Dixon's deletions of text message history, Plaintiffs have lost the ability to recover communications Dixon may have had with other members of the Millville Police Department about the facts of these pending civil cases.  Notwithstanding Dixon's expected assertion that he never had any relevant communications with anyone about anything, it is worth remembering that, "No discovery rule in the Federal Rules of Civil Procedure requires that a party accept, without seeking corroborating or impeaching evidence, its opponent's version of the facts." Tesser v. Board of Educ., 154 F. Supp.2d 388, 395 (E.D.N.Y. 2001).  One of the main reasons for taking discovery is to test the veracity of an opposing party's assertions made in litigation, not just accept them at face value.

Subdivision (e)(2) of Rule 37, on the other hand, does not include a requirement that the court find prejudice to the party deprived of the information. Id. This is because "the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." Id. Courts should exercise caution, however, in using the measures specified in (e)(2)." Id. "Finding an intent to deprive another party of the lost information does not require a court to adopt any of the measures listed in subdivision (e)(2)." Id.

**B.    The Standards for Sanctions Under Federal Rule of Civil Procedure 37(e).**

In determining what sanctions to impose, courts are guided by the Third Circuit's three-factor test in Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994). Under

the <u>Schmid</u> test, courts consider, "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." <u>Id.</u>

As the district court in <u>Bistrian</u>, <u>supra</u>, also observed:

> A party "is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation." This common-law standard is an objective one, asking not whether a party actually anticipated litigation, but "whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." The "reasonably foreseeable" test "is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." It requires something more than the "distant possibility" of litigation, but it does not require that litigation be "imminent, or probable without significant contingencies."
>
> The duty to preserve arises no later than when a lawsuit is filed but may be triggered earlier than the filing of the complaint depending on the particular circumstances. There is no single bright line that definitively marks when litigation reasonably should be anticipated. Instead, courts consider a variety of factors, including the type and seriousness of the injury; how often similar kinds of incidents lead to litigation; the "course of conduct between the parties, including past litigation or threatened litigation"; and what steps both parties took after the incident and before the loss of the evidence, including whether the defendant initiated an investigation into the incident. When a party argues that spoliation occurred before the complaint was filed, the court must conduct a fact-sensitive inquiry to determine at what point the spoliating party reasonably should have anticipated the litigation.

<u>Id.</u>, 448 F. Supp.3d at 468 (footnotes omitted).

Under Rule 37(e), moreover, spoliation warrants an adverse inference only if a party acted "with the intent to deprive another party of the information's use in the litigation"—if, in other words, the spoliating party acted in bad faith. <u>Id.</u>, 448 F. Supp.3d at 475 (footnote omitted). Because courts are unable to "examine [a party's] head" to "confirm [whether they] acted in bad

faith," courts look to circumstantial evidence to determine intent. Id. (footnote omitted). The timing of the destruction can be a factor. Id. (footnote omitted). So can the method of deletion—automatic overwriting is generally less culpable than affirmative deletion, which in turn is less culpable than taking additional steps to erase backup copies. Id. (footnote omitted). Selective preservation can also reflect intent. Id. at 475-76.

In Bistrian, the district court found that circumstantial evidence of intent was relatively weak. Id. at 476. In that case, a hallway video in connection with a prison assault was automatically overwritten, not affirmatively deleted, and there was no indication that most of the prison staff were actually subjectively aware that litigation was likely within a short overwriting window. Id. The court there stated that it was unable to find that the United States acted with intent to deprive plaintiff of the hallway video, and therefore the court would not draw an adverse inference. Id. at 478.

The case of Moody v. CSX Transp., Inc., 271 F. Supp.3d 410, 431 (W.D.N.Y. 2017) is further instructive. That case involved a train accident where the defendants' foreman uploaded data from the incident onto a laptop and then purportedly uploaded the data onto a backup server. The data was not properly loaded onto the backup server and was eventually lost when the foreman's laptop was recycled by the defendants. Given the importance of the evidence, the district court held that the defendants' conduct was "so stunningly derelict as to evince intentionality." Id., 271 F. Supp.3d at 432. The district court concluded that an adverse instruction would appropriately address the evidentiary gap caused by defendants' loss of such material evidence. Id.

In this case, Defendant Dixon was, as early as the service of the May 25, 2018 Capps tort claim notice, aware of possible (if not likely) litigation involving his conduct of excessive force.

19

See, e.g., Zhang v. City of New York, No. 17-cv-5415 (JFK) (OTW) (S.D.N.Y. Aug. 20, 2019)

(finding defendants' duty to preserve arose when plaintiffs filed their Personal Injury Claim Form,

providing explicit notice of a forthcoming death and medical malpractice lawsuit), Exhibit "R" to

the Certification of Counsel.  And to summarize, there are several overarching themes from the

Dixon ESI deposition, and the procedural events leading up to it, which warrant the imposition of

harsh sanctions here:

* In addition to the May 2018 tort claim notice, Dixon was aware of the Capps lawsuit in early May of 2019;

* Plaintiffs' discovery requests from October of 2019 and re-sent in January of 2020 sought Dixon's ESI, social media and electronic communications with Defendants Orndorf, Chief Farabella, and other members of the Millville Police Department;

* Dixon testified that it was possible that he deleted some text messages to and from other Millville Police Department employees from May 1, 2019 to the present;

* Dixon deleted his Facebook account in approximately April of 2020, when he was already aware of the Capps litigation;

* Dixon's sole stated reason for deleting his Facebook account during the ongoing litigation he knew about was given as "mental health";[2]

---

[2] Dixon's testimony that he deleted his Facebook account because of "mental health" emerges as utterly lacking in credibility when the court considers Edelson v. Cheung, No. 2: 13-cv-5870-JLL-JAD, 2017 WL 150241 (D.N.J. Jan. 12, 2017).  See Exhibit "S" to the Certification of Counsel. There, the district court concluded that defendant intended to deprive plaintiff of ESI when it found that defendant's testimony that he deleted e-mails because his computer was acting "sluggish" lacked credibility "considering the timing in which he deleted the emails and evidence that he was attempting to prevent others from reading the communications at issue." Id., 2017 WL 150241, at *4.  The Court cannot credit this explanation, particularly in light of Dixon's false certification prior to his ESI deposition that he did not destroy or alter evidence sought in Plaintiffs' discovery requests.

    \*      Dixon's October 13, 2021 Supplemental Certification that, "I have not **purposely or intentionally altered or destroyed any materials** sought in Plaintiffs' Request for Production of Documents" is clearly not true;

    \*      Dixon claimed that the first time he became aware of the need to preserve ESI was just weeks ago at the end of September 2021 when the Court entered an Order, yet he went looking for his old and deleted Facebook account eight to nine months earlier; and

    \*      Finally, if Dixon is at least telling the truth that some ESI – ESI he did not already delete – was preserved when he switched from an iPhone 10 to an iPhone 13 (after the issuance of the Court's ESI deposition Order), then that phone or cloud database should be available for inspection.

Simply put, this is not a case about an organizational overwriting policy that somehow might lessen Dixon's culpability, or about someone just being "stunningly derelict" for not properly loading ESI onto a back-up server.  Dixon engaged in affirmative, intentional deletion of social media information and records of communications <u>while litigation was pending</u>.

## VI.  CONCLUSION

Under Federal Rule of Civil Procedure 37(a)(5)(A), when a discovery motion is granted pursuant to Rule 37, the Court must "require the party ... whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorneys' fees."  Plaintiffs make such a request for attorney's fees and costs involved in connection with what has been a significant and labor-intensive effort to discover the extent of Dixon's misconduct, and Plaintiffs reserve the right to submit an appropriate fee petition at the Court's direction.

Yet in terms of non-monetary sanctions, severe sanctions are warranted.  Dixon, who is on probation for criminal convictions stemming from his assaults on Plaintiffs Capps and Joyce, has

not learned from that experience. In these civil actions, Dixon responded to written discovery with objections and limited information, and declined to make any effort to provide ESI. To date, he has provided no documents. And Dixon's initial, certified discovery responses are nearly worthless, and reflect that he failed even to make the most basic effort to reproduce the questions being asked of him in the same documents containing his responses. This, in and of itself, reflects an unacceptable *laissez-faire* approach to a party's discovery obligations.

But when Plaintiffs brought to Defendants' attention this past summer that their discovery responses and production were deficient, Dixon doubled down. He provided an uncertified response, and continued to take the position that ESI was not discoverable. At one of the telephone conferences the parties participated in with the Court, the Court made clear that ESI was, in fact, subject to discovery, it ordered Dixon and others to provide certified supplemental discovery responses, and it ordered that Dixon's deposition regarding ESI and social media to be taken. Then, following the conclusion of another deposition in this case, it was maintained on Dixon's behalf that Dixon's phone or cloud information for what ESI may still remain on his phone will not be turned over by December 15, 2021 – unless Dixon now decides to change his position in the interim. But that is where the parties left it following the November 23, 2021 Bryan Orndorf deposition.

Dixon has obstructed discovery at every possible opportunity, not just by doing as little as possible to respond, and by providing no documents whatsoever, but also by affirmatively deleting discoverable information during pending litigation. Indeed, the deletion of the "Stevie Joe" Facebook account occurred <u>after</u> Plaintiffs propounded discovery requests in October 2019 and re-sent them again in January of 2020. What is more, Dixon's October 21, 2021 deposition testimony

demonstrates that his October 13, 2021 Supplemental Certification that, "I have not purposely or intentionally altered or destroyed any materials sought in Plaintiffs' Request for Production of Documents," was simply not true. A comparison of what Plaintiffs sought in discovery as far back as October 2019 with what Dixon testified to deleting helps to connect the dots. Also driving home the point was Dixon's inconsistent testimony on his awareness of the duty to preserve ESI. Dixon would have the Court believe that no one advised him of the obligations to look for or to preserve ESI until this Court's September 29, 2021 Order. If true, that should be troubling to the Court. But Dixon's testimony on that point is plainly undercut by his separate testimony that he went looking to try to recover his Facebook account eight or nine months before.

Ultimately, Dixon has nowhere to go in this litigation. Neither he nor his various co-defendants, despite filing numerous and extensive motions to dismiss earlier in this case, has ever cited any case law suggesting that a police officer who has felony assault convictions – under the highest standard of proof (beyond a reasonable doubt) -- for the same assaultive conduct that is the subject of a plaintiff's later civil suit, would be entitled to qualified immunity. Dixon surely would have alerted the Court if there was such authority.

Having nowhere to go, Dixon chose the path of thwarting discovery. It is therefore time to sanction Dixon by: (1) ordering that an adverse inference be read at the time of trial, that the jury must assume that the ESI lost was unfavorable to Dixon; (2) allowing Plaintiffs to also introduce evidence at trial on the circumstances surrounding Dixon's destruction of ESI; and (3) entering an award in Plaintiffs' favor for attorney's fees and costs associated with uncovering the depth of Dixon's unacceptable conduct in this civil case. Finally, the Court should order Dixon to turn over his cell phone or the data cloud equivalent, encompassing all ESI that has not already been deleted,

for a forensic inspection and copying, and assess the costs of doing so against Dixon.

Respectfully submitted,

LOUIS CHARLES SHAPIRO

cc:    A. Michael Barker, Esquire
       Thomas B. Reynolds, Esquire
       Justin T. Loughry, Esquire
       Ms. Audra S. Capps and Mr. Douglas Robert Gibson, Jr.
       Ms. Tanika Joyce